OSCN Found Document:Question Submitted by: Representative Steve Bashore, Oklahoma House of Representatives, District 7, Representative Cody Maynard, Oklahoma House of Representatives, District 21, Senator David Bullard, Oklahoma Senate, District 6

 

 
 Question Submitted by: Representative Steve Bashore, Oklahoma House of Representatives, District 7, Representative Cody Maynard, Oklahoma House of Representatives, District 21, Senator David Bullard, Oklahoma Senate, District 6
2025 OK AG 2
Decided: 02/06/2025
Oklahoma Attorney General Opinions
Cite as: 2025 OK AG 2, __ __

 

ATTORNEY GENERAL OPINION
¶0 This office has received your requests for an Attorney General Opinion in which you ask, in effect, the following questions:
1. Does Oklahoma law require an out-of-state medical practitioner to obtain a license from an Oklahoma professional licensing board in order to provide care in the practitioner's home state to Oklahoma residents who are temporarily in the practitioner's home state?
2. Does Oklahoma law require an out-of-state medical practitioner to obtain a license from an Oklahoma professional licensing board to issue a prescription for a non-controlled or controlled dangerous drug when the patient care and prescribing occur outside of Oklahoma? 
3. Does Oklahoma law require an out-of-state medical practitioner, who is not licensed by an Oklahoma professional licensing board, to obtain a registration from the Oklahoma Bureau of Narcotics and Dangerous Drugs Control ("OBNDD") when the patient care occurs outside of Oklahoma but a prescription for a controlled drug is sent to an Oklahoma pharmacy? ¶1 
I.
SUMMARY
¶1 Oklahoma law does not require out-of-state medical practitioners to possess an Oklahoma license from an Oklahoma professional licensing board prior to seeing Oklahoma residents outside of Oklahoma. Further, an out-of-state medical practitioner is not required to have an Oklahoma license before prescribing a controlled or non-controlled drug to an Oklahoma resident when the patient care occurs outside of Oklahoma. Finally, the Uniform Controlled Dangerous Substances Act ("UCDSA"), --2-309 & 2-401--2-413.1, does not require an out-of-state licensed practitioner who provides patient care outside of Oklahoma to register with OBNDD before sending a prescription for a controlled drug to an Oklahoma pharmacy.
II.
BACKGROUND
¶2 The above questions originate from a recent interpretation of Oklahoma law by the Executive Director of the Oklahoma State Board of Osteopathic Examiners ("OSBOE"). The OSBOE asserts that an out-of-state medical practitioner cannot prescribe controlled substances to an Oklahoma resident if the medical practitioner does not possess an Oklahoma license to practice despite the practitioner-patient encounter occurring outside Oklahoma. Given that an overwhelming majority of Oklahoma's border counties qualify as a "Health Professional Shortage Area," Oklahomans living in border counties commonly travel to Arkansas, Colorado, Kansas, Missouri, or Texas to receive medical care and treatment. Accordingly, the OSBOE interpretation of Oklahoma law can potentially disrupt established practitioner-patient relationships and cause medical hardship to Oklahoma residents. This interpretation disrupted a long-standing norm under which out-of-state medical practitioners seeing Oklahoma residents in the practitioner's state of licensure send the patients' prescriptions to Oklahoma pharmacies. In response to OSBOE's interpretation, the OBNDD stated that it did not interpret the UCDSA to require an out-of-state practitioner to possess an OBNDD-issued registration because "[p]rescribing and dispensing are separate acts . . . ." Thus, under OBNDD's interpretation, an out-of-state practitioner is not prescribing into this state merely by transmitting or sending a prescription to an Oklahoma pharmacy.
III.
DISCUSSION
A. Standard of Review
¶3 "The goal of any inquiry into the meaning of a statutory enactment is to ascertain and give effect to the intent of the legislature." Yocum v. Greenbriar Nursing Home, , ¶ 9, , 219. The Legislature is presumed to have expressed its intent through the statutory text. Id. In other words, a plain and unambiguous statute receives the effect its language dictates. Id. (footnotes omitted). If the statute is ambiguous, then rules of statutory construction apply. YDF, Inc. v. Schlumar, Inc., , ¶ 6, , 658. "The test for ambiguity . . . is whether the statutory language is susceptible to more than one reasonable interpretation." In re J.L.M., , ¶ 5, , 338 (citation omitted). Ascertaining legislative intent requires both examining the statutory context and the statute's provisions in light of the entire act's purpose and objective. McIntosh v. Watkins, , ¶ 4, , 1096. "Any doubt . . . [is] resolved by . . . [looking] to other statutes relating to the same subject matter." Id.
¶4 Consideration is also given "to the various provisions of the relevant legislative scheme . . . and the public policy underlying that intent." YDF, , ¶ 6, 136 P.3d at 658 (quoting World Publishing Co. v. Miller, , ¶ 79, , 832). Additionally, statutes must be interpreted to give a "reasonable construction, one . . . [which] will avoid absurd consequences if this can be done without violating legislative intent." McIntosh, ¶ 4, 441 P.3d at 1096. Furthermore, Oklahoma courts afford great weight to an administrative interpretation of a statute if the agency is charged with executing the statute at issue and particularly where the Legislature has convened numerous times without disturbing the administrative construction. Peterson v. Oklahoma Tax Comm'n, , ¶ 16, , 391. Instead, a reviewing court regards legislative silence as acquiescence or approval of the administrative interpretation. Id. This office must do the same and act accordingly in reviewing the statutes at issue here when acting in a quasi-judicial capacity. See , ¶ 23 (citing State ex rel. York v. Turpen, , ¶ 11, , 767; Draper v. State, , ¶ 14, , 1147).
B. An out-of-state medical practitioner does not need an Oklahoma license to provide care to Oklahoma residents in the practitioner's home state.
¶5 Through established professional licensing boards, Oklahoma law regulates the practice of health care for doctors practicing allopathic medicine (MDs), doctors practicing osteopathic medicine ("DOs"), doctors practicing podiatric medicine (podiatrists), physician assistants (PAs), Advanced Practice Registered Nurses (APRNs), doctors practicing dentistry (dentists), doctors practicing optometry (optometrists), and doctors practicing veterinary medicine (veterinarians). The regulations function to require an Oklahoma professional licensing board to license these practitioners prior to practicing health care in this state.
¶6 Under Oklahoma law, the practice of health care generally "occurs where the patient is located at the time of the . . . [practitioner-patient] encounter, and therefore requires the . . . [practitioner] to be under the jurisdiction of the state . . . [licensing] board where the patient is located." . Therefore, the attending practitioner must have an Oklahoma license to render patient care lawfully if the patient is in Oklahoma when receiving health care. Put another way, an out-of-state practitioner does not need an Oklahoma license to lawfully render patient care to an Oklahoma resident who is in another state where the practitioner is otherwise licensed.
C. An out-of-state practitioner is not required under Oklahoma law to obtain a license from an Oklahoma professional licensing board before prescribing a controlled or non-controlled drug to an Oklahoma resident being seen outside of Oklahoma. 
¶7 You separately ask whether Oklahoma law requires an out-of-state practitioner to obtain a license from an Oklahoma professional licensing board before prescribing non-controlled or controlled dangerous drugs to an Oklahoma resident being seen outside of Oklahoma. As discussed above, the practice of medicine takes place outside of Oklahoma when the practitioner-patient encounter occurs outside this state. The act of prescribing is included within Oklahoma's definitions of the practice of health care. See (A); (B); (3); (2 & 5); (A); (B); (A). Consequently, Oklahoma law does not require out-of-state practitioners to be licensed in Oklahoma to provide health care, including prescribing, when the patient is outside of Oklahoma at the time of the practitioner-patient encounter.
D. The UCDSA does not require an out-of-state practitioner to possess an OBNDD registration under title 63, section 2-302 of the Oklahoma Statutes before sending a controlled drug prescription to an Oklahoma pharmacy. 
¶8 Your last question asks whether the UCDSA requires a practitioner to obtain a registration from OBNDD under title 63, section 2-302 when the patient care occurs outside of Oklahoma, but a controlled drug prescription is sent to an Oklahoma pharmacy. Accordingly, this office must construe provisions of the UCDSA relating to registration, prescribing, and dispensing to fully answer your inquiry.
¶9 Generally, the UCDSA authorizes physicians and other practitioners who comply with its registration requirement under title 63, section 2-302 to prescribe and administer controlled substances in the course of their professional practice. .
¶10 The registration requirement under the UCDSA provides:
Every person who manufactures, distributes, dispenses[, or] prescribes . . . any controlled dangerous substance within or into this state, or who proposes to engage in the manufacture, distribution, dispensing[, or] prescribing . . . of any controlled dangerous substances within or into this state shall obtain a registration issued by the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control, in accordance with rules promulgated by the Director.
(A) (emphasis added).
¶11 In a vacuum, subsection A of section 2-302 subjects every person, without exception, to the registration requirement under title 63, section 2-302 if the person dispenses or prescribes any controlled dangerous substance within Oklahoma or that enters Oklahoma. However, other provisions of the UCDSA illuminate and render such a narrow and literal interpretation erroneous. See Keating v. Edmondson, , ¶ 8, (legislative intent controls statutory interpretation and this office must look to the whole act in light of its purposes and objectives, considering relevant sections and subsections together). First, subsection H of section 2-302 establishes nine exemptions to the general registration requirement in subsection A. Furthermore, section 2-302 expressly addresses out-of-state persons who are subject to the OBNDD registration requirement. Significantly here, only out-of-state pharmaceutical suppliers and wholesale distributors who provide or supply controlled dangerous substances to Oklahoma pharmacies must obtain an OBNDD registration. (B). No similar express registration requirement exists for an out-of-state prescriber. See Patterson v. Beall, , ¶ 24, , 845 ("[T]he maxim 'expressio unius est exclusio alterius,' that the mention of one thing in a statute impliedly excludes another thing, is used to determine legislative intent." (citing PSO v. State ex rel. Corporation Commission, , , 753)). Accordingly, the UCDSA does not require an out-of-state practitioner to obtain an OBNDD registration under section 2-302 prior to sending a controlled drug prescription into Oklahoma.
¶12 The final component of your inquiry asks whether an out-of-state practitioner who "sends" a controlled drug prescription to an Oklahoma pharmacy must obtain an OBNDD registration. In the context of your question, this office understands your inquiry relates to electronic prescribing. Oklahoma law requires practitioners to use electronic prescribing for all controlled dangerous substances in Schedules II, III, IV, and V. (A), (B)(1). However, nothing in section 2-309 specifically requires practitioners to register with OBNDD before issuing an electronic prescription for a controlled dangerous substance. Therefore, the UCDSA does not require an out-of-state licensed practitioner who provides patient care outside of Oklahoma to register with OBNDD before prescribing a controlled drug and electronically sending it to an Oklahoma pharmacy.
¶13 It is, therefore, the official Opinion of the Attorney General that:
1. An out-of-state medical practitioner does not need an Oklahoma license to provide care to Oklahoma residents in the practitioner's home state outside of Oklahoma.
2. An out-of-state practitioner is not required under Oklahoma law to obtain a license from an Oklahoma professional licensing board before prescribing a controlled or non-controlled drug to an Oklahoma resident being seen outside of Oklahoma. 
3. The UCDSA does not require an out-of-state practitioner to possess an OBNDD registration under title 63, section 2-302 of the Oklahoma Statutes before sending a controlled drug prescription to an Oklahoma pharmacy. 
GENTNER DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA
BRENNA GIBSON
ASSISTANT ATTORNEY GENERAL
FOOTNOTES
 As a result, this office knows at least one health care provider in Missouri that ceased sending all prescriptions to Oklahoma pharmacies for Oklahoma residents receiving health care services from a Missouri medical practitioner unless the practitioner possesses an Oklahoma license.
 Oklahoma State Department of Health, Primary Care of Health Professional Shortage Areas (HPSAs) (2022), https://oklahoma.gov/content/dam/ok/en/health/health2/aem-documents/organization/center-for-health-innovation-and-effectiveness/data-and-reports/Primary-Care-HPSA-Scores.pdf (last visited Feb. 6, 2025).
 Director Donnie Anderson, Statement from the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control Relating to Oklahoma Pharmacies Filling Prescriptions Written by Out-of-State Practitioners (2024), https://www.obndd.ok.gov/Home/Components/News/News/138/16 (last visited Feb. 6, 2025).
 These professionals will collectively be referred to as "medical practitioners" or "practitioners" throughout this opinion. See also generally (22); (42).
 It logically follows that a medical practitioner must have an Oklahoma license to provide healthcare services via telehealth communications (i.e., telehealth) to Oklahoma residents who are in Oklahoma when receiving services. See (A); (A); see also 21 U.S.C. § 802(54) (2018).
 Though you do not directly inquire, your question implicates whether a pharmacist licensed by the Oklahoma Pharmacy Board may fill a prescription written or issued by a practitioner licensed in another state but not in Oklahoma. As thorough as the Oklahoma Pharmacy Act ("Pharmacy Act"), --355.4, may be, none of its more than fifty definitions or more than thirty statutory sections directly address this issue except insofar as it relates to APRNs and PAs. However, outside of the instances in title 59, section 353.1a relating to APRNs and PAs, the Pharmacy Act is noticeably silent regarding whether an Oklahoma licensed pharmacist may dispense a controlled or non-controlled drug based on a prescription from practitioners (other than APRNs and PAs) licensed and otherwise authorized to practice in another state. But see (authorizing an APRN and a PA to prescribe limited controlled dangerous substances). The OBNDD states that "[f]or decades, it has been the accepted and well-known practice for Oklahoma pharmacies to recognize the legitimacy of prescriptions written by practitioners licensed in other states." See supra footnote 3. The OBNDD is an agency established by statute within the UCDSA and its Director has authority to determine if a practitioner is prescribing to a person engaging in unlawful efforts to fill or refill a prescription. King v. State, , ¶ 5, , 843; ; ; but see Okla. Admin. Code § 535:15-3-11(a) (prohibiting the filling or refilling of a prescription unless it is from an authorized prescriber, defined under title 59, section 353.1(40) as a person licensed in this state and authorized to prescribe dangerous drugs within the scope of their practice); and .
This office encourages the Legislature to examine the Oklahoma laws regarding prescribing and dispensing authority and provide unambiguous direction regarding whether an Oklahoma-licensed pharmacist may dispense a prescription from an out-of-state practitioner. Authorizing these practices is a matter of legislative discretion and this office is available to discuss the historical and current statutory framework and legal ramifications relating to it, including lawful interplay of state law and the Interstate Commerce Clause in Article I, Section 8 of the U.S. Constitution's. See State v. Rasmussen, 213 N.W.2d 661 (Iowa 1973); 1982 Ohio Op. Atty. Gen. 2-119; 1999 Ky. Op. Atty. Gen. 2-41 (concerning state restrictions on out-of-state practitioners and prescribing authority).
 Among other licensed professionals, the UCDSA refers to medical providers as "practitioners." (42)(a).
 See ("Words used in any statute are to be understood in their ordinary sense, except when a contrary intention plainly appears[.]") Also, the Oklahoma Supreme Court "has relied on dictionary definitions to provide the plain, ordinary meaning of terms." Brassfield v. State, , ¶ 8, , 941. Merriam-Webster defines "every" as "each individual or part of a group without exception" and "into" as "a function word to indicate entry" and "in the direction of." Every, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/every (last visited Feb. 6, 2025); Into, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/into (last visited Feb. 6, 2025).
 Further supporting this construction are the 2018 legislative amendments to section 2-302, addressing a growing state and national opioid health epidemic. House Bill 2796, 2018 Okla. Sess. Laws ch. 251, § 1, https://www.sos.ok.gov/documents/legislation/56th/2018/2R/HB/2796.pdf?d=202520614 (last visited Feb. 6, 2025); Oklahoma Senate, Committee approves bills to tackle opioid addiction in state (2018), https://oksenate.gov/press-releases/committee-approves-bills-tackle-opioid-addiction-state (last visited Feb. 6, 2025). The 2018 legislative amendments stem from the Oklahoma Commission on Opioid Abuse recommending the Legislature enact laws subjecting suppliers, manufacturers, and wholesale distributors to the registration requirement. See 2018 Final Report, Oklahoma Commission on Opioid Abuse (on file with author). At least in part, the Legislature adopted the Commission recommendations, enacting laws that thereafter subject wholesale distributors and suppliers to (a) substantive reporting mandates, and (b) the registration requirement if they provide or distribute controlled substances "within or into this state." See supra House Bill 2796 (codified at (B & D--E)).
 The OBNDD also does not construe the UCDSA to require an out-of-state practitioner to obtain a registration under 2-302. See supra footnote 3; see also Oral Roberts Univ. v. Oklahoma Tax Comm'n, , ¶ 9, , 1015; Stipe v. State ex rel. Bd. Of Trustees of Oklahoma Pub. Employees Ret. Sys., , ¶ 22, , 126 (courts will not disturb the administrative construction of a statute when the Legislature had acquiesced or otherwise not disapproved the agency interpretation); and (A) (OBNDD is responsible for "promulgat[ing] rules and regulations relating to the registration and control of the manufacture, distribution, dispensing[, or] prescribing . . . of controlled dangerous substances within this state.").
 See also Oklahoma Bureau of Narcotics & Dangerous Drugs Control, Electronic Prescribing and Prescription Pads, https://www.obndd.ok.gov/registration-and-pmp/e-prescribing-and-rx-pads (last visited Feb. 6, 2025); House Bill No. 2931, 2018 Okla. Sess. Laws ch. 255,
https://www.sos.ok.gov/documents/legislation/56th/2018/2R/HB/2931.pdf?d=202520614 (last visited Feb. 6, 2025) (amendment adding requirement that all scheduled drugs be electronically prescribed).
 Cf. (A)(10) (specifically requiring practitioners to be registered in Oklahoma in order to purchase OBNDD-issued prescription forms).
 See supra footnote 7.